IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RAYMOND L. KYSAR, PATSY SUE KYSAR,
and the KYSAR FAMILY TRUST,

        Plaintiffs,

vs                              No. CIV 00-958 LFG/KBM-ACE

AMOCO PRODUCTION COMPANY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Plaintiffs' ("the Kysars") Motion for Summary Judgment [Doc. 35], and Defendant Amoco Production Company's (Amoco) Motion for Summary Judgment [Doc. 44]. Responses and replies have been filed on both motions. Oral argument is not necessary; this matter may be decided on the briefs.

### Background

This is a dispute about access to a gas well. The Kysars bring this action against Amoco, alleging Amoco is unlawfully trespassing on Kysar property by using roads across the property in order to operate and service a gas well drilled by Amoco on BLM land adjacent to the Kysars'. The following facts are undisputed and are taken from the Pretrial Order and the Statements of Facts included in the parties' briefing on these motions.

The Kysars are owners of the surface rights in a parcel of land located along the Animas River in San Juan County, New Mexico. They acquired this land in separate purchases; the predecessor in interest to the northern portion was Jessie Maude Keys ("Keys"), and the



predecessor in interest to the southern portion was Onofre Jaquez ("Jaquez").[1]

On July 3, 1948, under "the Keys lease," Keys leased to C.H. Nye ("Nye"), the oil and gas rights underlying 344 acres of her fee lands. Nye later assigned the lease to Stanolind Oil and Gas Company ("Stanolind"). On June 10, 1953, Keys and Stanolind amended the Keys lease to provide that the owner of the mineral rights, at its option and without the surface owner's joinder or further consent, could pool and unitize the leasehold estate with any other land or lease covering adjacent lands, "so as to create by such pooling and unitization, one or more drilling or production units." (Ex. B to Doc. 38). Amoco is the successor in interest to Stanolind under the Keys lease. The Kysars are successors in interest to Keys with regard to surface rights.

The pooling/unitizing option was exercised in 1992, as to a 37-acre portion of the Keys leasehold, when the federal government executed and approved a communitization agreement under authority of the Mineral Leasing Act, 30 U.S.C. § 226(j) [now § 226(m)]. The federal government owns land ("the BLM land") immediately adjacent to the portion of the Kysar property which was previously owned by Keys and which is the included in the Keys lease. The government decided to unitize the BLM land with other properties in the area, including the 37-acre portion of Keys lease land, as it was authorized to do under the Mineral Leasing Act. That Act provides:

> For the purposes of more properly conserving the natural resources of any oil or gas pool, field, or like area, or any part thereof ... lessees thereof ... may unite with each other, or jointly or separately with others, in collectively adopting and operating under a cooperative or unit plan of development or operation of such pool,

---

[1] A diagram of the property at issue herein, taken from an exhibit included in Kysar's response memorandum, is attached hereto as Exhibit A.

2

> field, or like area, or any part thereof, whenever determined and certified by the Secretary of the Interior to be necessary or advisable in the public interest. The Secretary is thereunto authorized, in his discretion, with the consent of the holders of leases involved, to establish, alter, change, or revoke drilling, producing, rental, minimum royalty, and royalty requirements of such leases ... in connection with the institution and operation of any such cooperative or unit plan as he may deem necessary or proper to secure the proper protection of the public interest.
>
> ***
>
> When separate tracts cannot be independently developed and operated in conformity with an established well-spacing or development program, any lease, or a portion thereof, may be pooled with other lands, whether or not owned by the United States, under a communitization or drilling agreement ... when determined by the Secretary of the Interior to be in the public interest, and operations or production pursuant to such an agreement shall be deemed to be operations or production as to each such lease committed thereto.

30 U.S.C. § 226(m).

The 1992 communitization agreement at issue in this case includes similar language. Under this agreement, the government determined that "the Federal lease or leases as to the lands committed to the attached agreement cannot be independently developed and operated in conformity with the well-spacing program established for the field or area in which said lands are located, and that consummation and approval of the agreement will be in the public interest." (Ex. C to dock. 38). And the government further "[c]ertif[ied] and determine[d] that the drilling, producing, rental, minimum royalty and royalty requirements of the Federal lease or leases committed to said agreement are hereby established, altered, changed, or revoked to conform with the terms and conditions of the agreement." (Id).

Amoco drilled a gas well, the "Sullivan Gas Com E-1 Well," hereinafter referred to as the

3

"Sullivan E well," on BLM land adjacent to the Kysars' "Keys lease" property (*i.e.*, the northern portion of the Kysar holdings). The Sullivan E well is not on the Kysars' property, but it is within the unitized, or "communitized," area created by the 1992 agreement, which also includes a portion of the Kysars' land.

There are currently six wells located on the Kysars' property in San Juan County. One of these wells is very close to the Sullivan E well and was drilled by Amoco in 1954. This well, and others on the Kysars' property, have been accessed in the past by Amoco and its predecessors by means of two roads across the Kysar property. Amoco's access to the 1954 well is not in dispute. The parties agree that Amoco has the right to travel over the Kysars' property to operate this well. One of these access roads crosses the Animas River over a suspension bridge. The Kysars asked Amoco not to use this road (which will be referred to herein as "the bridge road"), because they felt the bridge could not sustain heavy equipment. Instead, they asked Amoco to use what is called the "back gate" road, which runs from a public highway through the southern portion of the Kysar lands (derived from Jaquez), and over the Keys lease lands to the 1954 well. This back gate road branches off at a point within the Keys lease land and goes up to the boundary of the Kysar lands and beyond, onto the BLM property where the Sullivan E well is situated. Although Amoco acceded to the Kysars' request that it use the back gate road to access wells on Kysar property, Amoco maintains that it nevertheless has a legal right to use the bridge road, which runs entirely through Keys lease property. The back gate road, as noted above, crosses part of the former Jaquez property before entering the Keys lease portion of Kysar lands.

Plaintiff contends that Amoco is trespassing by using the back gate road, or any road across its lands, to access the Sullivan E well, which is situated in the adjoining BLM tract.

Amoco argues that it is not trespassing because it has a legal right to use either road to get to the Sullivan E well, by virtue of the communitization agreement. The Court agrees that Amoco has a legal right to access the Sullivan E well across the Kysar lands and therefore that the Kysars have no claim for trespass.

## Discussion

A. <u>Purchasers of Surface Rights Take Property Subject to the Dominant Mineral Estate</u>

It is a fundamental common law principle that the holder of mineral rights in a parcel of land has the dominant estate over the servient surface lands, and that a valid mineral lease implicitly vests in the mineral lessee the right to possession and use of the surface premises to the extent reasonably necessary to develop and operate the mineral rights, whether or not the lease contains explicit easement language. <u>Livingston v. Indian Territory Illuminating Oil Co.</u>, 91 F.2d 833 (10th Cir. 1937). This is so because, without access to excavate the resources, the owner of mineral rights would have no means of enjoying the property and its value would thereby be destroyed. <u>Porter v. Mack Mfg. Co.</u>, 65 W. Va. 636, 64 S.E. 853 (1909); <u>Buck Creek R. Co. v. Haws</u>, 253 Ky. 203, 69 S.W.2d 333 (1934).

> When Carter Farms' grantor agreed to execute an oil and gas lease to Amoco rather than develop the minerals himself, he conveyed to Amoco his right to explore for and extract the minerals . . . Amoco, as the mineral lessee, is entitled to use so much of the surface area as is reasonably necessary for its drilling and production operations . . . Amoco's surface rights and the servitude it holds, however, must be exercised with due regard for the rights of the surface owner.

<u>Amoco Prod. Co. v. Carter Farms Co.</u>, 103 N.M. 117, 703 P.2d 894 (1985).

The purchaser of surface rights takes the property subject to any existing oil and gas leases

5

and the rights of the mineral owners to use the surface to extract the minerals:

> The Millers own only the surface. Their title to the surface was acquired after execution of the oil and gas leases and with both actual and constructive knowledge of the rights of the owners of the minerals and royalties. Under such circumstances the mineral and royalty owners hold the dominant estate and have the right to use as much of Millers' surface and to use it in such manner as is reasonably necessary to effectuate the purposes of such leases.

Miller v. Crown Central Petroleum Corp., 309 S.W. 2d 876, 877 (Tex. Civ. App. 1958). *See also*, Dunn v. Southwest Ardmore Tulip Creek Sand Unit, 548 P.2d 685, 687 (Okla. App. 1976) ("When the plaintiffs purchased the 110 acres of surface rights, there was an additional burden on the land: a valid and subsisting oil and gas lease").

In this case, the Kysars purchased their property subject to the existing oil and gas lease negotiated by their predecessor in interest, which implicitly gave the lessee the right to use the surface for all purposes reasonably necessary to extract the minerals. In addition, by the 1953 amendment, the lessee also had a right, without the consent of the surface owner, to unitize its leasehold estate with other lands or leases to create a drilling or production unit. This right was exercised in 1992 and a 37-acre portion of the Kysar's property, which was subject to the oil and gas lease, was included in the communitized area along with some adjacent BLM land.

Amoco's original choice for a well site in the communitized area was within this 37-acre parcel belonging to the Kysars. However, Ray Kysar was opposed to having a gas well located in his alfalfa field, and Amoco decided instead to drill outside of the 37-acre parcel, on BLM land which is adjacent to the Kysar property and is also within the communitized area. Amoco has been using the roads crossing Kysar property, outside of the communitized area, for access to the well on BLM land. It argues that the communitization agreement gives it the same right to access

this well as it has to access its wells on the Kysars' property.

Since it is clear that the Kysars purchased their property subject to the rights of the mineral lessee, which includes the rights to drill gas wells on property within the Keys lease, to access those wells across the surface of the lease, and to put all or a portion of the lands covered by the Keys lease into a communitization arrangement, the above described sequence of events raises the following issues:

By virtue of the communitization agreement, are the Kysars obligated to allow Amoco to cross their land within the communitized area to access the Sullivan E gas well on adjacent BLM which is also part of the unit?

Are the Kysars further obligated to allow Amoco access to the Sullivan E well across their land which is outside of the communitized area but still within the Keys lease?

And finally, are the Kysars obligated to allow Amoco to access the Sullivan E well by means of a road which crosses not only Kysar land within the Keys lease, but also crosses contiguous Kysar land which was purchased from Onofre Jaquez and was never within the Keys lease?

The Court agrees with Amoco that the answer to each of these questions is yes, that Amoco has the right to enter Kysar lands over the back gate road to access the Sullivan E well, and that such use does not constitute trespass. Summary judgment in favor of Amoco is therefore appropriate.

B. Communitization Extends the Rights of Surface Use Over the Entire Unitized Area.

Unitization, or communitization, is a method of pooling various oil and gas leasehold interests, to achieve maximum efficient production from a mineral reservoir underlying the surface

7

lands. When lands have been communitized, gas production anywhere on a gas field is deemed to occur on each lease within the communitized area. Williams, Ezekiel J., "Lands and Natural Resources Survey," 70 Den. U. L. Rev. 811, 821 (1993).

> Unitization is the agreement to jointly operate an entire producing reservoir or a prospectively productive area of oil and/or gas. The entire unit area is operated as a single entity, without regard to lease boundaries, and allows for the maximum recovery of production from the reservoir. Costs are reduced because the reservoir can be produced by utilizing the most efficient spacing pattern, separate tank batteries are not necessary, and there is no requirement to drill unnecessary offset wells. The objective of unitization is to provide for the unified development and operation of an entire geologic prospect or producing reservoir so that exploration, drilling and production can proceed in the most efficient and economical manner by one operator.
> Communitization, or pooling as it is usually called where nonfederal lands are involved, is the agreement to combine small tracts for the purpose of committing enough acreage to form the spacing and conservation requirements . . . The object of communitization is to provide for the development of separate tracts which could not be independently developed or operated in conformity with well spacing patterns established in the area . . ..

2 Rocky Mountain Mineral Law Foundation, Law of Federal Oil and Gas Leases § 18.01[2] (2001).

"One of the primary objectives of all oil and gas leasing . . . is the conservation of resources through unitization agreements designed to preserve the natural lifting pressure of oil bearing formations by limiting the number of wells which may be sunk to any one pool . . . [T]he unit is ultimately designed to conserve the resources of geologic structures . . .." Standard Oil Co. of Cal. v. Hickel, 317 F. Supp. 1192, 1195 (D. Ala. 1970), aff'd, 450 F.2d 493 (9th Cir. 1971). A lessee of mineral rights within a unitized area "is under an obligation to reasonably develop all oil and gas underlying the communitized acreage. The respective federal and state

agencies have jurisdiction, power and authority to enforce the obligation of reasonable development as dictated by geologic and petroleum engineering expertise." Kenai Oil & Gas, Inc. v. Dept. of the Interior, 671 F.2d 383, 389 (10th Cir. 1982) (Barrett, J, concurring).

Drilling operations conducted anywhere within a communitized area are deemed to occur on each lease within the communitized area, and production anywhere in the unit is considered to be produced from each tract within the unit. Id., at 384; Cheyenne-Arapaho Tribes of Oklahoma v. United States, 966 F.2d 583, 585 (10th Cir. 1992). This principle has often been used to extend the life of leases, based on production from off-lease land within a unit; however, it is also applicable to the right of mineral lessees to use all surface land within a unitized area for the benefit of the pooled mineral rights. If production anywhere in a unit is considered to be production from each tract, then each surface tract within a unit is subject to the right of reasonable ingress and egress by lessees for the purposes of extracting minerals from the unit.

> When the mineral and surface estates are severed, the mineral estate
> is the dominant estate . . . The owner of the severed mineral estate
> and its lessee have the right to use the surface to the extent that is
> reasonably necessary to develop and produce the minerals . . . This
> implied surface easement of reasonable usage extends to the surface
> of the pooled or unitized area.

Property Owners of Leisure Land, Inc. v. Woolf & Magee, Inc., 786 S.W. 2d 757, 760 (Tex. App. 1990).

*See also*, Gulf Oil Corp. v. Deese, 275 Ala. 178, 153 So.2d 614 (1963) (where adjacent lands are part of the same unit, unitization of mineral estates for oil production alters the general rule that the right to use the surface of land as an incident of ownership of mineral rights does not carry with it the right to use the surface in aid of mining operations on adjacent lands); Lone Star

Producing Co. v. Jury, 445 P.2d 284 (Okla. 1968) (oil and gas lease underlying plaintiffs' residential lot, coupled with a unitization agreement including plaintiffs' land, gave unit operator the right to locate a power pumping station on property adjacent to plaintiff's home and within the same unit, without liability to plaintiffs for vibrations emanating therefrom in the absence of willful or negligent acts causing damage to plaintiffs' property); Reimer v. Gulf Oil Corp., 281 Ark. 377, 664 S.W. 2d 456 (1984) (where lease provides that well site within same drilling unit as an adjacent surface estate is deemed to be part of the adjacent estate, lessee has the right to cross the adjacent estate to access the well). It is true that in Reimer, the lease granted an explicit right to construct such roads on the surface lands as necessary to drill for gas on the land, whereas there is no such explicit right granted in the Keys lease involved in the present case. However, as noted above, a mineral lessee's right to use the surface for access is implied in law and need not be expressly set forth in the lease.

Therefore, if Amoco were trying to access the Sullivan E well across the 37-acre portion of the Keys lease which is included in the communitization area along with the BLM land, there would be no question of trespass. Because the roads in this case are located outside of the communitization area, however, the Court must next determine whether access across these roads is allowable in the absence of the Kysars' authorization.

C. A Mineral Lessee Has the Right to Use the Entire Surface Area of the Lease, Even Portions Not Within a Unitized Area, For Access to Operations Within the Unitized Area.

As noted above, the bridge road passes across the Kysars' property in an area subject to the Keys lease and thus within an area in which Amoco holds the mineral estate. The Kysar lands, however, extend beyond the 37-acre parcel that is part of the communitization area, and the bridge

road access is located outside of this 37-acre parcel, although still within Keys lease land. The question then arises whether a mineral lessee has the right to use the entire surface area of a lease for access to a drilling site on adjacent property within the communitized area, when only a portion of the surface lands subject to the mineral lease are included in the communitized area. The Court concludes that such a right is created by virtue of the communitization.

In <u>Acree v. Shell Oil Co.</u>, 548 F. Supp. 1150, 1154 (M.D. La. 1982), *aff'd*, 721 F.2d 524 (5th Cir. 1983), a case involving a lessee's right to lay a pipeline across plaintiff's property for transportation of minerals from a well on land outside plaintiff's property but within an area unitized along with plaintiff's, the court interpreted language in the lease to mean that "if any acreage within the lease is unitized with a producing well, the surface of the leased tract may be used to transport production from the unit well."

The lease language at issue in <u>Acree</u> is not present in the Keys lease, but the result should nevertheless be the same. A communitization agreement has the effect of changing the terms of those leases pooled within the communitization area, so that the entire lease, not just that portion of the land within the unitization area, is subject to the benefits and burdens of communitization. "[T]he communitization agreement, by its terms, affects both the <u>lands</u> described as being committed to the communitization area and each <u>lease</u> committed to the agreement [emphasis in original]." <u>Wolff v. Belco Dev. Corp.</u>, 736 P.2d 730, 733 (Wyo. 1987). In making this statement, the <u>Wolff</u> court was referring to language in a communitization agreement identical to that contained in the communitization agreement at issue in this case, *to wit*:

> The commencement, completion, continued operation or production of a well or wells for communitized substances on the communitized area shall be construed and considered as the

11

> commencement, completion, continued operation or production on
> each and all of the lands within and comprising said communitized
> area, and operations or production pursuant to this agreement shall
> be deemed to be operations or production as to each lease
> committed thereto.

(Communitization Agreement, Ex. C to Doc. 38). If production on any lands within the unit is deemed to be an operation or production as to each lease, then the whole of the Keys lease should be subject to Amoco's right of access. Although the 1953 amendment to the mineral lease, giving the lessee the right to communitize, states that production from a well on any portion of the unit shall not have the effect of continuing the lease in force as to lands not included in the unit, this language is directly contradicted by the later communitization language, quoted above. Terms of a communitization agreement which conflict with a lease can implicitly modify the lease terms; the modification need not be explicit. Carrigan v. Exxon Co., 877 F.2d 1237, 1242-43 (5th Cir. 1989).

The Court therefore rejects the Kysars' argument, based on the case of Mountain Fuel Supply Co. v. Smith, 471 F.2d 594 (10th Cir. 1973), that a communitization agreement has no effect on surface easements unless the underlying mineral lease is explicitly modified. [*See*, Plaintiff's Response Brief, Doc. 40 at 11, 17]. The Kysars misinterpret Mountain Fuel. They focus on the following language by the Tenth Circuit for their argument that unitization does not affect a lease unless the lease is formally modified:

> The fact that the field has been unitized is of no significance other
> than to the extent that the particular leases covering the minerals
> under the defendants' surface may have been actually and legally
> modified thereby [*i.e.*, by the unitization agreement] as to the issues
> raised in this suit.

Mountain Fuel, at 597. It is apparent from this language that a lease may be actually modified

12

by the parties, or it may be "legally modified," that is, modified by operation of law, by a unitization agreement, and this comports with the purpose of communitization as set forth in the federal statutes governing the practice, as well as by the specific language of the communitization agreement involved in this case.

Under 30 U.S.C. § 226(m), the Secretary of the Interior is:

> authorized, in his discretion, with the consent of the holders of leases involved, to establish, alter, change, or revoke drilling, producing, rental, minimum royalty, and royalty requirements of such leases . . . in connection with the institution and operation of any such cooperative or unit plan as he may deem necessary or proper to secure the proper protection of the public interest.

The communitization agreement in this case provides, "Except as herein modified and changed, the oil and gas leases subject to this agreement shall remain in full force and effect as originally made and issued." (Ex. C to Doc. 38, at ¶ 6). The communization agreement thus "modifies and changes" the Keys lease by providing that "operations or production pursuant to this agreement shall be deemed to be operations or production as to each lease committed hereto." (Ex. C. to Doc. 38, at ¶ 8). The agreement does not say "as to those portions of the lease within the communitization boundaries," but says rather "as to each such lease." The lessee "committed" the Keys lease to the communitization agreement, as it had the right to do under the lease without any consent by the surface owner, and the entire lease was thereby affected by the agreement, in the sense that drilling on any part of the communitized area, even on lands outside of the Keys lease, would have the effect of extending the lease as to the entire Keys lease tract and, the Court now finds as well, also in the sense that the surface area of the entire tract could be made available for Amoco's access to a well in the communitized area.

13

The Kysars argue that this result unfairly burdens the surface estate in relation to the royalty interest, which is not increased by communitization. Amoco counters that Plaintiffs do not own any royalty interest in the Sullivan E well. However, the Court need not resolve the issue of any royalty rights the Kysars may have, nor balance those rights against the burden on the land, since the question of the Kysars' royalty interest is not material to the outcome of this controversy. Parties are free to contract for whatever arrangement of rights they think best, and that is what occurred when Maude Keys, the Kysars' predecessor in interest, leased the mineral rights in her property. She also agreed to allow the mineral lessee to pool the mineral rights with adjoining leases in a communitization arrangement and thereby made the surface subject to legal rights and obligations arising from any future communitization. Keys bargained for and signed the mineral lease and its amendment, presumably because she felt it had some benefit to her which outweighed the burden it thereby placed on the surface. In the absence of fraud, undue influence or unconscionability, it is not the province of the court to alter or amend a contract reached by the parties. Smith v. Price's Creameries, 98 N.M. 541, 545, 650 P.2d 825, 829 (1982). Thus, the Court will not re-weigh the parties' bargaining calculations at this late date.

> The well here was located and constructed pursuant to a pooling order under Act No. 1, and Deese's land was a part of the pooled unit. If Deese owned the oil under his land, he would share in the oil produced from the well, even though he might not have any interest whatever in the tract where the well is located. In that situation, would it not be fair and reasonable that the surface owned by him should be available for use in connection with the construction and operation of the well, so long as such use is reasonably necessary for drilling and producing oil from the pool? Manifestly so, it seems to us. The question then arises: If he does not own any interest in the oil, and hence receives no benefit from its production, then why should his surface interest be burdened by action taken in recovering the oil? The obvious answer is that he

acquired the surface subject to the right of the owner of the oil thereunder to use the surface in such manner as is reasonably necessary to recover the oil. And Gulf is the present owner of that right.

Gulf Oil Corp. v. Deese, at 618-19.

The fact that other oil and gas companies may have negotiated with the Kysars and paid for access rights does not convince the Court that Amoco must do so as well. There has been no evidence presented to show that these other companies have any mineral rights in the Keys property, and it is Amoco's mineral interests under the Keys lease which provide the foundation for its right to access. The Court finds that the communitization agreement in this case modified the Keys lease, to the extent that it gave Amoco the right to access the Sullivan E well across any lands within the lease area.

D. A Mineral Lessee Has the Right to Use the Surface of Adjacent Parcels Outside the Area of the Lease, if They Are Contiguous To Lease Lands and Owned by the Same Surface Owner.

Although Amoco previously used the bridge road for access to its wells on Kysar lands, it stopped doing so at the request of Ray Kysar, who had concerns about heavy equipment crossing the bridge. Kysar had no objection to Amoco's use of the back gate road for access to on-lease drilling operations, even though a portion of that road crosses contiguous Kysar lands outside the area of the Keys lease. The Kysars' objection is to Amoco's use of the back gate road (or any road across its property) for access to the Sullivan E well on BLM lands.

Amoco takes the position that, although it acceded to Kysar's request that it use the back gate road, it nevertheless has the right to use the bridge road to cross Keys lease lands for access to wells on Kysar property, and also to access the Sullivan E well on the adjacent BLM land within the communitized area. As discussed above, the Court agrees that Amoco has the right to

15

use any road within the Keys lease, including the bridge road, for access to the Sullivan E well.[2] The question remains whether Amoco has the right to use the back gate road, part of which crosses over Kysar property derived from Onofre Jaquez, not from Maude Keys, and which is not part of the Keys lease. The Court finds that Amoco does have that right.

In Mountain Fuel Supply Co. v. Smith, *supra*, the Tenth Circuit held that the mineral lessee had the right to use all portions of a surface owner's land for access, even though the land was derived from several different predecessors in interest and had, at one time, been subject to several different mineral leases:

> It is apparent that here initially the eleven separate patents ... created eleven surface tracts in separate ownership. Had there been mineral development commenced at that time it would have to have been conducted with regard to the separate surface ownerships ... However, with the convergence of the several surface titles in the defendants, the reason for treatment of the surface as composed of eleven separate tracts no longer exists. Thus there is now, according to the record, but one surface tract in common ownership of the defendants to be considered in the permitted use of the servient estate by the mineral owner or its lessee.

Mountain Fuel, at 597. The court goes on to say that the lessees are restricted in their use of the surface by the geographic extent of their leases, except insofar as the leases have been either formally modified by the parties or modified by operation of law due to unitization. Id. In the present case, as discussed above, the lease has been modified by communitization. Mountain Fuel supports Amoco's right to use not only the bridge road but also the back gate road throughout the

---

[2]This right is, as always, subject to Amoco's duty of reasonable and non-negligent surface use, so that any danger to the bridge would have to be taken into account. Amoco is entitled to use so much of the surface area as is reasonably necessary for its drilling and production, with due regard for Kysar's rights as the surface owner. Amoco Prod. Co. v. Carter Farms Co.

16

contiguous extent of the Kysar property to access the Sullivan E well, and the Court so holds.

The Kysars' complaint alleges a cause of action for trespass, unjust enrichment, and violation of the New Mexico Unfair Practices Act. The Court finds that Amoco has the right to use the Kysar lands in the manner described above and that its actions do not therefore constitute trespass as a matter of law. Plaintiffs' claims for unjust enrichment and statutory violations are dependent on the existence of a trespass and misrepresentation as to the right of access and, there being no trespass and no misrepresentation, those claims will be dismissed. For the reasons given above, Amoco's motion will be granted and Plaintiffs' motion will be denied.

IT IS THEREFORE ORDERED that Amoco's Motion for Summary Judgment [Doc. 44] is granted, and the Kysars' Motion for Summary Judgment [Doc. 35] is denied. All claims are dismissed, and judgment will be entered in favor of Defendant.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge



Diagram is schematic and approximate

EXHIBIT A

40